May it please the court, Fred Rowley Jr. for the government. The government respectfully submits that the district court erred in invalidating the search warrant because the supporting affidavit, even if redacted, sets forth sufficient facts and circumstances for probable cause. The search warrant affidavit noted first that there was a significant amount of cash in the two packages that were bound for Lebanon. We say even if redacted. Redacted to exclude what? Your Honor, one of the statements in the affidavit, of course, is challenged. And that challenge statement is the no declaration of U.S. currency statement. So the government submits that should be excised from the search warrant affidavit for purposes of testing probable cause. And in addition to that, the correct information about how properly to comply with the currency reporting requirements ought to be read in. And even if the court does that, there's sufficient facts and circumstances for probable cause. So the government's challenge by nature is sort of a Franks challenge. Excise the challenge statement. Include the allegedly omitted information and assess whether there's been any. Then you have to bring it back for purposes of Leon. I believe that's right, Your Honor. If the court were to conclude that the affidavit read in that Franks sort of way is insufficient, then you would need to move on to a Leon challenge, although probably the court would need to remand, because if the court were to find, for example, that there's not enough in the affidavit taking that approach and the court were to conclude that that statement was material, there would need to be a hearing to determine whether it were reckless or intentionally made to mislead the magistrate judge. And there just wasn't a hearing. But the government submits the court doesn't need to reach that question because the affidavit, if that statement is redacted and the omitted information is included, is sufficient for probable cause if you consider everything that's in it, and that would include the large amount of time. What is there in the affidavit about the crime? It certainly, the affidavit certainly, you know, if the crime was sending the money, there'd be no question there'd be probable cause. But what you have is no information whatsoever in the affidavit about whether this has been reported. And there was plenty of information available if you're looking for circumstantial evidence. You say that five times previously in the year they had shipped money. They checked all kinds of computer records, but nobody checked to see whether they had reported the other five shipments. Your Honor, I think that the circumstantial evidence in the affidavit that the court would look to in addition to the amount of money, the fact that the money was concealed inside clothes, inside boxes. It was a clothing business, right? It was, Your Honor. And they shipped their normal product, and that's where the money was. Your Honor, it was enclosed. But that's why the identity of the consignee and the consignee that was legal. Those pieces seem exceedingly weak to me. The identity of the consignee was his wife, right? Your Honor, in fact, the consignee was his wife. Right. So what's wrong with that? Your Honor, at the time, again, it's based upon the information in the affidavit. Right. And what they knew was Nasrin Saab, I believe was the name, was on the record checks done by the agents an alias for Nasrin Awad. Alias meaning it was her maiden name. And that's why it was another name for her. But alias suggests that there's something nefarious about it. That's exactly right, Your Honor. You know, after the fact, in hindsight, it is the defendant's wife, and that is her maiden name, but probable cause has to be tested on the facts in the affidavit and based upon the information known at the time. And here's why the consignee is significant. And there was also a suggestion that there was something odd about sending something to somebody who lived in California and Lebanon. What's odd about that? She was – I mean, people go other places. True, Your Honor. But assuming – first of all, it was pretty clear, even on the information they knew, that they're probably related based upon the information. So what's odd about that? It's odd, Your Honor, because if you were trying to convey that large amount of money in a secure fashion to somebody who resided in Los Angeles and, indeed, resided in the same house as one of the shippers, there are any number of other ways that you could do that. Well, that's true, but what's – the real problem here, as Judge Reinhart says, is that shipping the money is not a crime. That's right, Your Honor. It's not a crime. And therefore, anything – how are facts dealing with the fact that they ship the money instead of wiring it, relevant to whether there was a crime? Your Honor, most people – the reason why it's suspicious is it's a significant amount of money. And as one of the courts has noted, most people don't either transport or carry $280,000 in cash. And I suppose the government can make it a crime to ship $280,000 in cash, but they didn't do that. The reason why the identity of the consignee, the use of an alias, and the employee's nervousness is significant is because it tends to refute the notion that the only reason this money was concealed in clothes, the only reason why the packages were mislabeled, was for security reasons. Because this person lived in L.A. and, indeed, lived in the same – Isn't the word – I mean, saying in the affidavit that this is an alias is, if anything, a misrepresentation. I mean, it suggests that there is something odd about her use of that name, and there isn't. Your Honor, in fact, in hindsight, there isn't. Now, I don't think that that was challenged as a misrepresentation below. I – you know, and I'm not quite sure because I didn't do the – Well, we don't know whether there is or isn't. That's right. Some women use their born name all the time, never change the name when they get married. And then, of course, as far as I know, my mother never, ever used her maiden name again after she married my father, and that was very common. Well, and some share back and forth. Some share – when it comes to charging the purchases to the husband, they use their husband's name. The rest of the time, they're happy to use their own name. That's not uncommon. But we don't – we don't know. I mean, the point is, we don't know – That's right. I mean, I don't know whether it was a misrepresentation or whether it was, you know, just a name that she used intermittently. Well, that's right. You know, the true facts, all the facts, including information about why there was so much cash on hand, why the money was being shipped, all those – the facts that the defense points out may well be true, but those are, again, facts learned in hindsight. They go to establishing a possible – The net result of this probable cause of termination was that the – 12 people came to his house at 7 in the morning, took him out of bed, handcuffed him, put him in a police car, so on and so on, right? And they did all of that without – as far as the affidavit is concerned – now, it turns out that they probably – maybe did – checking an easily available source of information, a computer they already had, at least to find out whether they were wrong about the crime, right? In other words, if they had – suppose all along his name was sitting there and he had registered it, and they didn't bother to find that out. Instead, they went and they took him out of bed and handcuffed him and drew guns at him and so on and so on. Does that make any sense as a way for the government to operate? Your Honor, a couple of responses. I believe that the way that the search was conducted was challenged in the district court. I think – I understand that, but it is a possible consequence of behaving in this way. I understand it's not what this case is about. But if we say it's okay to find probable cause without even looking at the registry and at least telling the magistrate – even if the answer was no, he's not there – at least telling the magistrate he's not there, but that's not necessarily dispositive because of the timing, at least telling him that much. Your Honor, as the government stated in its brief, in an ideal affidavit, that information would have been in the search warrant affidavit. But in this case, on these particular facts, the information that was set forth in the   It was not in the search warrant affidavit. And there was obviously no great rush. I mean, you could have waited a day or two. You got it on a Friday. You didn't serve it until a Monday. There was no urgency about it. Your Honor, I believe that the search warrant was issued on the 24th in the late afternoon and it was executed on the 27th. That's what I said, Friday and on a Monday. So it was not urgent that you do this immediately when you got the warrant. You could have gotten the warrant on Monday. And then you would have had another couple of days' worth of stuff there. But there was no hurry. This was not an urgent circumstance. He'd shipped five packages earlier in the year, two in the preceding period. Why couldn't you? Well, first of all, there's no reason you couldn't have checked to see what the records showed. And secondly, there was no reason not to wait a day or two. There was nothing you were that worried about. If you'd been that worried, you would have served it on Saturday instead of waiting until Monday. Your Honor, there is a concern if the government were going to wait, to be sure, because there would have to be enough time for that report if it were filed on the last day, as the shipper was entitled to do under Federal regulations, for it to get to D.C. and be processed by customs, if you were going to be sure. Now, as the government has noted, really, in an ideal affidavit, it would have been in there. But in this case, given the amount of money in the search – I'm sorry, the amount of money in the packages, as the affidavit stated – and I'm worried I'm running out of time. Don't worry. Go ahead. We've got lots of time. Thank you. Some time. Given the facts that were in the affidavit, the amount of money, the identity of the consignee, the apparent use of an alias, and the nervousness of an employee, there's enough there for a probable cause. Now, it might not be enough. Let me just say one other thing about the alias. The name of Mr. Iwata and of his company was on the shipping bills, right? I believe that it was Trace Hermanos was on one of the airway bills. And Iwata was on the other, right? Ali Iwata, I believe. I believe it was Ali Iwata. Who was Ali Iwata? Somebody else? I think it turned out to be the shipper, the defendant's nephew. Anyway, there was no trouble finding them. There was no trouble finding out who these people were from what was on the shipping bills, right? I gather that, Your Honor. So it's a little hard to say what the alias could have, what was the point of it. The transaction looks unnecessarily convoluted if you assume that Nazarene Iwata is indeed in Lebanon, because she is, and it's reasonable to infer from the information they knew, a resident of Los Angeles. It would have been easy to electronically transfer the money, to wire it, to hand her cashier's checks, to take to Lebanon if that's what she's doing. Indeed, she could have carried the cash to Lebanon and filed a currency report then. And that's why the identity of the consignee the government submits is significant, because it makes the transaction look stranger. And if she's, in fact, in Los Angeles. What did they know about the five earlier shipments at the time of the search? They did. I believe that the five shipments are referenced in the affidavit, but there's no discussion. Was one of those shipments, in fact, reported and registered? I thought one was. I don't know the answer to that, Your Honor. I thought it was a January one, which it turns out was registered. I don't know the answer to that, Your Honor. Well, suppose it's true and they didn't check that. That's one of the problems, that nobody knows the answer, because nobody tried to find out. I mean, why wouldn't you, if you'd known these people were regularly shipping packages? They might have been regularly reporting it. It would have saved everybody this whole problem. At least, why wouldn't somebody check? Now, don't tell me it's not a perfect world. That I know. It's an affidavit by the government. It can't be a perfect world. But why in the world, in any world, knowing that somebody regularly ships packages, would you go rush out and arrest them this way without seeing if their regular practice is to file reports? Your Honor, the trial assistant did tell the district court that there was, in fact, a database check run and that that information just wasn't put in the affidavit. And it should have been. And indeed, it would have helped the government's probable cause case if there was no report filed for the previous shipments. You didn't get a chance to answer my question. I was asking about the five earlier shipments. Yes, Your Honor. You said they were aware that there were shipments. Were they aware that there was money in those shipments? I don't think so, Your Honor. We don't know. I think that's right. And so the absence of reports from those shipments may simply mean there was no money in them. There would be no way of saying we know money was shipped and no report was filed. That's right, because we didn't intercept those packages. I'm sorry. We don't know anything about those packages other than the fact that they were sent from this address. That's my understanding. But if they had had money in them and had reported them, that would have avoided everything. That would have tended to suggest that they did not intend to evade the reporting requirements. If I may have a... How much, what was the last date on which they could file the report? I believe that under the CFRs, they can file a currency report on the date of mailing. They could mail it out on the date of mailing. Because it says, I've actually got the text here. It says that reports required by 1023A for currency or other monetary instruments not physically accompanying a person departing from the United States may be filed by mail on or before the date of entry, departure, mailing, or shipping. And what exactly was suppressed in this case? I mean, I'm not quite sure why all this matters very much anyway. Your Honor, I believe that what was suppressed was the $2 million in cash that were seized during the searches, and also following that, some statements that were made by the defendant. But not the actual shipment? No, because that was the ship – the cash in the shipments were the subject of a separate motion to suppress that I believe was denied. So therefore, in terms of the government – I couldn't tell from the record. The case did not go forward, I take it, however. No, I think it's – Interlocutory appeal. That's right. It stayed pending. But the government presumably still has the money that they in fact shipped. That's right. And the question – and information – well, in a way, by doing what you did at the time you did it, you sort of eliminated – well, not really. So you still have the question of whether – you know whether they registered or didn't register now. So is your case intact as to this money? Well, we would be able to use the evidence that was seized or that was discovered inside the shipments, but we don't have the defendant's statements, which are important evidence. I see. So that's what you're saying. The statements are important. And the $2 million in cash, you know, the government would probably also seek to introduce, although I think that might be the subject of a separate motion in Limine. I see. So it's based on the statements. I'm not sure how the other money helps you. Yeah. It's not drug money as far as we know. Right. So it's not like – It's the – I think the statements are the main evidence, Your Honor. But the statements are not highly incriminatory. What they tend to establish is knowledge of the currency regulations. That's right. That's all. There's certainly nothing guilty about anything he said. He says, yes, I know about it. My – They tend to go to knowledge and just knowledge. It clearly was a stupid thing to do. I don't know how that helps the government any. They tend to go to knowledge, Your Honor. Which is an essential element and which is difficult to prove in these cases ordinarily. That's right, Your Honor. All right. Thank you. And it's clear that the statement is suppressible if the search warrant is banned. At the end of the hearing in the district court, there was argument on that. And I think Judge Minnelli ruled on that and ruled that it was fruit of the search. Well, we have an opinion – we have a footnote and an opinion from Judge Reinhart. The case by the name of Grubbs. It says that. She ruled that way. But you're not – you're not contesting that now. No. The only thing we have before us is the search. No. And I don't think that the connection between the statements and the search was the subject of separate motions practiced or anything like that. I think it just came up at the hearing. Okay. Thank you. May it please the Court. Nathan Hockman on behalf of Moneer Awada. We couldn't concur more with the – Your Honor's analysis of basically a woefully deficient – That was mine. I don't get it at all. All I heard was a bunch of questions. But, you know, these people stuff a bunch of cash in clothing and send them off to Lebanon and that's not suspicious enough to get a warrant on? I sort of don't – I don't get it. I mean, you know. Well, Your Honor, the reason – well, let me start over. As Your Honor – as Your Honor has stated, if the crime was simply sending money in a package over $10,000 and concealing it overseas, there was sufficient probable cause to believe that that crime occurred. Congress has not – Yeah, but the reason people don't use wire transfers is to avoid these reporting requirements. Normally the way you transfer money is you don't stuff it in a FedEx and risk that somebody along the way is going to walk off with a package and then label it as $20 worth of clothes. You do that because you have a reason. You know, one plausible reason for doing that is to avoid the law. Well, but the law, though, says that you have to do two things. Know about a reporting requirement. And, again, this is not an airport situation where there's signs posted everywhere, where they hand you the forms. This is sending the money through, in this case, a DHL service. And the second is actually failing to comply. Do you have any case law that says that there has to be probable cause as to the knowledge element beyond, you know, the usual probable cause that people know what they're doing? That seems difficult to me. Well, again, the – there's nothing unique about the probable cause of termination in this case except for one crucial fact. You have to have evidence. And we don't necessarily need direct evidence. It can be circumstantial evidence, any evidence in the affidavit that says that this person knew that there was a reporting requirement. Well, I'm asking you where – whether you have any support for that first proposition, that the probable cause has to go to every element, including a mens rea element. Your Honor, I don't have more than just the – I can certainly submit after this the general law. I don't have it handy in my mind, quite honestly. It says that you have to be able to show that every element in order to prove that a crime committed. I'm not sure that's so. I don't know. I would point out, though, that the unique fact about a currency reporting requirement crime is that there has to be a report. And the second unique fact is that it's information that's directly in the government's control as to whether there's a report. Absolutely. And that's, again, all he literally had to do. And remember, this is just – this is not just Special Agent Quintanilla. There's seven other custom agents working with him during his one-day investigation. Any one of these eight people could have gone to the customs computer, pushed a button, and find out several things. If the prior five shipments, which occurred – this is now in December – occurred in April, May, and October, if any of those reports had been filed for those shipments. And by the way, we don't even know if cash was in those shipments, because no further investigation was done of that information. Well, what could he investigate? Send somebody to Lebanon and go through the trash and find out whether there's any cash marks on those FedEx packages? Well, again, you can – I mean, they're gone. You can interview people, Your Honor. I mean, typically, in the cases we're talking about – Well, if they had shipped cash and reported it, you would have found that. Alternatively. As it was pointed out earlier, if they had shipped cash and made the filing of that information – Am I wrong that there is some record that there's at least one package that was reported? There was not, Your Honor. No, I'm wrong? I don't know where I got that from. No. It was just the five packages. They didn't know if there was cash in them. All they know is that DHL picked up five packages from Tres Hermanos and sent them to – sent them to Lebanon. That was the full extent of the record. But the agent was using that to make the assertion, based on his training and experience, that there was a wide-scale – that was his words – bulk cash smuggling operation going on at Tres Hermanos. Very good guess. Two million dollars they find in cash there? How long would it have taken the package to arrive in Lebanon? Again, the record is silent on that. It could have taken anywhere – I'm just guessing – a week, ten days, I have no idea. It's the Christmas time, Your Honor. I think it was something more on the order of 48 hours. At which point, somebody in Lebanon would have picked up the phone and said, hey, the cash hasn't arrived, you better hide whatever you've got lying around, because Federalis, or whatever they call U.S. customs agents in Beirut, have probably got the package. The package was sent when? The package was sent on – two packages. One's on Friday, December 20th – First package. I'm sorry? The first package. The one that was intercepted. There were two that were intercepted, Your Honor. The first one was on Friday. That was the second one, wasn't it? No, the first one was Friday, December 20th. 20th. The second was Monday, December 23rd. They do the search warrant – So December 20th, they send a package that DHL people notice the cash in. And intercepts, correct. They don't send it on. You know, and this is now – what date was the search made? December 27th, the following Friday, a week later. I'm surprised that they still have too many dollars of cash there. And that's the point, Your Honor. They should have called in 48 hours. Exactly. They easily could have called in 48 hours. But it was already seven days. If they had called in 48 hours, Your Honor, and said that the second package on December 23rd would never have been sent, because presumably they would have known that the – No, no. I understand. And maybe they weren't as good as the Federal agents had caused to fear. But these things – I mean, they had pretty good reason to fear that at some point, sooner rather than later, the first package would be missed, and somebody would call and alert the sender to hiding further evidence. Seven days later, it does not take seven days to carry something to Lebanon. It takes about 48 hours. If you add a little bit of time for customs, you're looking at three days, four days, a week at the most. This is about the time when people would have pretty good reason to start – I mean, when the Federal agents would have caused to start worrying about the missing package and somebody alerting people in the United States to hide evidence. It's actually surprising it didn't happen. And again, Your Honor, looking at the four corners of the – Number one, the fact that the government now raises some type of exigency argument on appeal, which, by the way, wasn't raised down below. It's pretty obvious. They must have been very delinquent agents if they were that concerned and waited three days after they got the warrant. Exactly. It doesn't sound like they were that concerned. If they were so concerned, Your Honor, that somehow the – Mr. Awada or Tres Hermanos was going to all of a sudden discover that the December 20th package – This is something I don't understand. This crime was completed when everything – when the money was sent and it wasn't registered on the day it was supposed to be registered. How is what they found in the house at all – what do they need any of it for in order to prove their crime? The only – the significance of what they found in the house is not the – is nothing more than the statement, Your Honor, because the government has already conceded that if this Court affirms Judge Minnella's granting of the motion to suppress, it cannot proceed because it lacks the evidence of knowledge of the reporting requirements. I'm asking something else. There was no exigency at all with regard to proving up this crime because this crime had already occurred and the only thing they needed was to wait a week or so to see whether or not the registration ever showed up in the computer system, period. As to knowledge, they would have to prove it however they proved it. But they had – it turned out that when they went to Mr. Awada, he did talk to them, but they couldn't count on that, so there was no reason they necessarily thought the search was going to help them with the knowledge. So what was there about the search that was exigent with respect to proving up this crime or had anything to do with proving up this crime? Absolutely nothing. There was nothing exigent about doing the search on that day or in that timeframe. But there could be something exigent, as Judge Kuczynski said, if they were concerned about future crimes. Again, if they were concerned about any of that, presumably it would have shown up in the warrant. I mean, excuse me, in the affidavit that there would be some concern that they had evidence, real evidence. Well, let's say there was a large-scale, you know, money-laundering operation in progress. And let me deal with that allegation, because in part that goes to the Leon argument. This agent only had several things – or had several things to rely on to make that assertion. One, he bases it on his training and experience. His training consisted of one course in an eight-month period that he had been a customs agent with an amorphous description of what he learned about money laundering. That's his training. He was then an agent for roughly nine months. In that nine months – More training than I have. What? Yet here I am, making this decision. Your Honor, I would actually say that – You see? But you're not basing – That's the way the world works. But you're not basing any of your statements on your training and experience in currency bulk-cash smuggling interdictions. No, I rely on agents who've had courses to teach them about that stuff. But then he bases it on his experience, Your Honor. Here's what his experience consisted of. Nothing. Absolutely nothing. He didn't do, apparently in that nine months, according to his affidavit, one search, one investigation, one arrest, or one prosecution in bulk-cash smuggling. Absolutely nothing. He's got to get experience somewhere. I'm sorry? He's got to get experience somewhere. Well, he's made it up. He literally has thrown a fact. It's like – Well, now he's got the experience, after he's done this. Certainly. Plus, he now has – he's now registered his one case. And he now, for the next affidavit, hopefully will do it – He'll be a real expert next time. Presumably. Hopefully he will do it correctly next time. The problem is we're dealing with this affidavit. So he bases his – based on his training – You don't have to be much of an expert to know that people don't stuff hundreds of thousands of dollars into FedEx back into closing, mark it as value $20, and send it off to foreign countries, unless they have a nefarious reason for doing so. Or at least there's a very good chance that they do. It sounds like the kind of – no, sure, they could have done more. They could have checked the computer files. But we don't have any indication that even checking the computer files would have undermined the case or helped your case any. Well, again – They could have done this. They could have done that. Again, if Congress had criminalized those actions, then we wouldn't be here today. There would be obviously – What if he had – the representation was made at the hearing that, in fact, they had checked the registry, but didn't put it in. Suppose they had put in that we checked the registry, the registry showed that nothing had been reported. If we take to the 24th, we – it could have shown up by then, and it also could not have. Suppose all of that was in the declaration. Would that change anything? What it would have done, Your Honor, is it would have eliminated one of two arguments, both of which I believe are fatal to this affidavit. One is the argument that there's absolutely no evidence that they checked or that he actually failed to file. That's the in fact argument. The second would then go back to his knowledge. So there would be some evidence that he failed to file, even if not totally reliable. Correct. There would at least be something in the record to deal with the in fact question. But the second part is, if you don't know you have the obligation at all, and the government has no evidence that shows that you have the obligation or that you know you have the obligation, you still haven't violated the criminal case. But that is really difficult. I mean, wouldn't that make it basically impossible to ever develop probable cause in one of these cases? I would concur with Judge Monella, who basically said under the scenario you just gave, that would be a much closer question, much closer. But she then said, but that's not the facts before the court. So I would say that it would be, if you had that information, Your Honor, could you then infer back and say, yeah, there's something there. The way I stated it, it's still in, you know, quite inchoate information, because they would obviously have to acknowledge that the fact that it wasn't showing up there wasn't necessarily dispositive or even close to dispositive, right? And I would, again, I would concur again that it's, that we would still have an argument. I would still be here arguing, Your Honor. I'd still have argued before Judge Monella. I'd have a... You might well be on the other side. Who knows. And I might, and Judge Monella might have, that might have tipped the scales, Your Honor. But Judge Monella focused on the fact that this was a readily, amply available avenue of investigation unique to the government. And I would argue that there is a need to inform the magistrate of such a thing. And I would argue that the magistrate of such a thing, it's one computer button. They had to push it. Apparently, they even did push it, which is even the, almost the insult to injury. And he didn't feel the need to inform the magistrate of such. I know, Leon. What would they have had to, the need to inform? I mean, they push a button. But let's say that they did and nothing comes up. What does that prove? You know, they don't know what's in those packages. I've sent any number of FedEx packages and not filed currency reporting things because they didn't have currency in them. I don't stuff thousands of dollars into FedEx packages. I mean, that's the reality, the reality that most packages that leave the country don't have such forms attached to them because it just isn't done. Of course, Your Honor. But the point would be that when Judge Minnell is looking at this affidavit, it wouldn't be a completely barren affidavit. The affidavit talks about large-scale continuing shipping of illegal packages. That's the whole basis of this. He has discovered a scheme where they're regularly shipping these things. If that's what their allegation is, that not just these two, but he's regularly shipping packages to Lebanon containing money, that would be shown or not shown if they checked and saw whether all those other packages that they allege contained money had reports. And that's correct, Your Honor. And again... No, it's not. No, it's not. They have two packages in a row that have money, right? Two packages get sent out. Two packages have large amounts of cash attached to them. It doesn't mean that those earlier packages necessarily have cash on them. And the fact that they don't have forms attached to them, without further investigation, you can't tell whether they were supposed to have forms. But again, Your Honor, you're absolutely correct. But I didn't make the... You can't both be correct. But I didn't make the allegation in my affidavit that there's a wide, based on my training and experience, there's a wide-scale bulk cash operation going on. $400,000 or $300,000 in cash and within a week in two packages sounds to me like a large-scale operation. I don't know. Maybe a new line of work it's not. But to me, that sounds pretty big. Well, again, if they had done any investigation, and they had done surveillance of Tres Hermanas, they would have... And they did do some... How about the fact that they asked the employee to sign the form? She looks nervous. Again, there's two different shipments. The first shipment, there's no allegation of nervousness at all. It's a young Latina woman who turns over the package, not a hint of nervousness. The second package, there's an allegation of nervousness. There's no physical description like you see in other cases where someone is stuttering, is caught in mouth, can't get the words out. It's just an allegation of nervousness. They ask her a question. Basically, will you sign here? She says, why do I have to sign? Because apparently, that hadn't been done in the past. They say, you've got to sign. But the first one wasn't nervous. She wasn't asked to sign anything. Well, we don't know. The record's silent on that. And then she said... And then they ask her a question. How much does this weigh? She says 10 pounds. All the other cases that talk about nervousness put in the fact that there's either an inconsistent statement or a lie in connection with the nervousness. She's right on the mark with 10 pounds. By the way, they never ask her, did you... Is this your package? Did you prepare this package? Questions never asked. They didn't leave. That's the nervousness. They also didn't ask her, did you put $100,000 in cash in here? They didn't ask her any question about the box other than its weight. And she answered it correctly. Again, all the cases that the government has cited based on nervousness include a whole array of information that shows that it's nothing... That the nervousness was one little part of it. And a little part in connection with lies, inconsistent statements. In some cases, prior convictions for narcotics are included in that panoply, the totality of circumstances. Here, Your Honor, we just had on one occasion in probably an encounter that lasted at less than a minute, two minutes, the amount of time it took to ask two questions, the nervousness aspect. I think these forms were, in fact, mail on the day of shipping. I'm sorry? I think those forms were, in fact, not mail on the day of shipping. As a factual matter, that's correct. I know it's a trivial thing, but... I'm sorry? As a factual matter, I'm sure it's a trivial thing, but... Well, I mean, obviously, if they were mailed, we wouldn't be here as well, because then there would have been no crime committed. Maybe they got lost in the mail. And here's the other aspect of it, Your Honor. The forms can actually even be mailed by an agent or a bailee of the sender. If you recall, Mr. Awada says in his statement that I knew about the reporting requirements when he's arrested, and my accountant handled it. So conceivably, the accountant could have gone ahead and filed the forms for him, but the agent didn't know one way or the other, because he never made the check. Can I ask a question? As a matter of fact, none was. As a matter of fact, none was. That's correct, Your Honor. On the Leon issue, Judge, District Court Judge seemed very concerned with her belief that there was a purposely false misstatement or misleading statement in the declaration. First of all, do you agree with the government that if we got to that issue, we would have to remand it? No. I do not believe that, Your Honor. Secondly, it's a sort of false misstatement, because there's nothing factually misstated about it. There's an implication about what the legal requirement is, but the statement is being made to a magistrate judge and a district judge who presumably have the means of finding out what the legal requirement is, and there's no direct misstatement of legal requirements. So why is it a misstatement? It's a misstatement, Your Honor, and I think this is what Judge Minella was focusing on, because it's completely misleading. If it was a company It's misleading to a district, federal district judge about what the law is? Yes, Your Honor, in the sense of that the agent is saying that he has unique training and experience in this area. And that includes, you know, presumably knowing the regulations as well as or better probably than a district court or magistrate judge at that moment in time. It's not a factual misstatement. It's factually correct, right? It's factually correct. But it is what makes it misleading is the one and only statement in an entire affidavit dealing with the reporting requirement. There is no If there were some other statements saying he checked the database, they didn't fill out the forms, the forms had to be mailed in. We don't know if they were mailed in, but we checked so far they're not mailed in. And by the way, the shipment contained no declaration. And what the judge said, which is appropriate, it's at worst misleading. No, what is it? At best irrelevant, at worst misleading. I mean, it's like saying the doctor's brand. It's irrelevant. But I have a hard time understanding how a statement which is a true statement and has no legal significance, in fact, can mislead a United States magistrate who want to know its laws. Again, if this agent had touted his training and experience in the area and put in one and only one statement dealing with the reporting requirement saying the shipment contained no declaration, that's the misleading aspect. I'm not even sure that it's irrelevant. I mean, if you want to look at the one thing you might do to avoid problems is make a copy of the form which you mail in to the government and put it in the package. And that way, if anybody opens a package, they'll see that the form has, in fact, been prepared. Allays concerns, allays delays. So it's not wholly irrelevant. I mean, it's a perfectly plausible thing that one might do. And if, in fact, the package contains such a copy of such a form, that would cast doubt on the government's application. I mean, let's say a form, in fact, had the copy of the form had, in fact, been put there, that would have probably weakened the government's application for a search warrant because one might infer, well, they went to the trouble of preparing a form. They obviously can understand the form is necessary. Here's a copy of it in the box. Chances are good they mailed one. The problem with that, Your Honor, is that the regulation is very specific. It says that you do not... You may not put a copy in the box? No, it says that you're not complying with anything by putting a copy in the box. No, but it's evidence. It's evidence that would make, you know, the kind of thing that happened here where the DHL agent finds a bunch of currency and it finds a government form. So, well, you know, look, I mean, maybe take it to the cons-federal agent and say,  that would be looked at much differently than just stuffing a bunch of money in a box with nothing, with a declaration on the outside that says $20. It's certainly evidence, Your Honor. But the point is, is that in the vacuum of this affidavit, where there's no other mention of a reporting requirement other than this... We can live in a vacuum. We have... We're surrounded by books. You know, believe it or not, we have computers which are attached to Lexis and Lexis and Westlaw, and you know what? You can get the federal regulations pretty easily. I don't know if you've ever done it, but I'm told it's easily done. I'm talking to my law class. Okay. Thank you. We've given you more than double your time. Thank you very much, Your Honor. Thank you. I shouldn't say we've given it to you. We've taken more than double your time. Briefly, Your Honor, just to address Judge Berzon's point, I do believe that you would have to have probable cause for the knowledge element, and the government has cited a case that says that GASHO, the government submits that the circumstances set forth in the affidavit, though, are sufficient to draw that inference, but you do have to have PC for that element. So how is that then? I mean, now all we know is that they put a bunch of money, which they had a legal right to do in a package, and shipped it. And we don't even really know that they didn't register it. And we have no direct evidence that they didn't register it. So where would you possibly get the evidence of knowledge, then, if we need it? Your Honor, it's bound up with the discussion that we had earlier. The government's position is that considering all the facts as a whole, it's reasonable to infer that the shipper intended to evade the reporting requirements, and you couldn't intend to evade the reporting requirements unless you knew of them. Why didn't he get the inference he intended to evade the reporting requirements? Why don't you get the inference that he's got illegal money? I mean, he's got illegal money, as the affidavit says. And he's trying to get rid of the illegal money without the government finding out about it, so he's not wiring it. Your Honor, if the Court is addressing that statement about money laundering, because that statement is challenged, the government is not relying on it. That's what it says. The affidavit says they're engaged in this wide-scale illegal activity. Now, why, if they're engaged in wide-scale illegal activity, shipping drug money or money laundering overseas regularly? That's their business. Then it makes sense they don't want to do it out in the open. But why does it make sense that they're doing it to evade the reporting? That they know there's a reporting requirement. Your Honor, it gets back to the discussion we had earlier. Considering all the facts, and that would include the amount of money, the mislabeling, also the identity of the consignee, and both, whether you treat it as an unnecessarily convoluted transaction, or just that it's possible that that's not the true consignee, because Ms. Rinawata is, in fact, in Los Angeles. All of those things. Yes, Your Honor. This is a nefarious scheme, and they're trying to conceal something. Yes, Your Honor. Assume all of that. Yes. Why is it reasonable to assume that they know that there's a reporting requirement? It's reasonable to assume, I follow you up to this, that they don't want the government to know that they're engaged in this illegal practice of money laundering. Yes, Your Honor. And therefore, they're covering up the money. And they don't want the government to discover it. That's all reasonable inference. Why is it also a reasonable inference that they happen to be aware that there's a statute that says you must report this? Yes. And they're trying to evade that statute also. The government submits that the most reasonable inference is that that's why they're shipping the cash and not, for example, using a cashier's check, which would generate a currency report or But it doesn't have to be the most reasonable inference. It can simply be It doesn't. It simply has to be a That's right. reasonably inference. I don't see why it's a reasonable inference. That's my question to you. Why, if they're engaged in criminal activity, why is it that it's Because for a person a reasonable inference when they don't want the government to find out. By shipping it out in the open. By registering it. In wiring the money, whatever. There's any number of ways they could have done it. What they were worried about is security. And the reasonable inference is that they were not, that what they were worried about is generating a currency report. Even if you don't know what precisely the motive is, for example, you don't know whether it's money laundering, tax evasion. If they knew there was such a thing as a need to have a money report, it would be a reasonable inference that they wanted to avoid it. Why is it a reasonable inference that they had knowledge that there was a reporting requirement? Because they could have done this transaction on the facts that are in the affidavit. They could have known that anything else they did would have generated a report. That isn't the same as knowing that this was supposed to generate a report. They could have known that if they wired money, there was going to be a report to the government. That's right. Okay. Fine. But that's not what you're claiming that they were evading, is it? Well, the point, the point is, Your Honor, that if you take that there are a lot of ways of safely conveying this money, but that those methods would actually generate a currency report, and that's what you're worried about, you wouldn't take one of those approaches. What you would do is ship the cash. They're worried about the government finding out about what they're doing. No question. Well, in the currency reports, I think the thinking would be, would help the government uncover that. See, what I think what Judge Ranha is getting at, there are two requirements. One of them is that you send a form. Yes. And you'll fail to do that. But there's also the mens rea requirement. You have to be aware of it. And I think what he's getting at is, how do you get evidence of this mental element? And do you need to sort of have proof that this mental element, the knowledge of the currency requirements, there was probable cause to believe that that existed? Your Honor, I think it's bound up in the government's position that it's reasonable to infer an intent to evade. To evade those requirements. Let me be more specific. You might have established an attempt to evade. Yes. The reporting requirements that I assume come up if you wire the money or send it through a bank. Right. Right? Right. So they sent it by cash. Right. But how do we get to the point that they are trying to avoid a requirement of reporting the cash, which is a separate requirement. It's not the same requirement. I see what the Court is getting at. Okay. The argument that I was making before tends to refute the notion that the reason why the money is concealed in this manner, stuffed inside clothes with a mislabeled package, that sort of thing, is to avoid theft. But the fact that the money is concealed in this manner and then shipped abroad, that suggests an intent to avoid the currency reporting requirement for the shipment. So you have to consider all of those things. I see where the Court is going. And that would be, the government submits proof of that. Suppose there were also a statute, a separate statute, that said in addition to notifying the government, you have to make out five copies of a document and file it in the Library of Congress. That's an additional statute. And you had to have knowledge of that statute, as you say. And you have to have probable cause that you know about that additional statute. Would this also demonstrate that you knew about that unique, unusual statute as well? In other words, Your Honor, I just want to make sure I understand the Court's hypothetical. In addition to filing a currency report for the two packages, you need it in addition to send a report to the government and file it in the... You have to send photostatic copies of the bills to Fort Knox. There's another. You must make copies of the bills and send them to Fort Knox. That's another unique statute. Sure. Little known. Sure. Now, would you say that this affidavit establishes probable cause, that they violated that statute as well? I think you would have to, Your Honor, because the idea is that because of the way that the money is packaged, because of the way it's mislabeled, and because of the surrounding circumstances, the shipper intends to evade any reporting requirement. No, the ship... Not that he intends to evade. The shipper has knowledge of every single Federal statute. That would be... I see where Your Honor is getting at. That would be tougher. Well, the generic question is, when you have a crime with a specific intent requirement, does your probable cause affidavit have to show that that element is satisfied, specific evidence of... And you're saying, yes, it does. I think that Gasho establishes that there's got to be PC. When you have a specific intent crime... You have to have Judge Kaczynski's question. Judge Berzan asked it before, and you said yes. His question is, do you have to, in your affidavit... Yes. ...establish probable cause of each element of the crime, including knowledge of the statute? Your Honor, I think what Gasho says, and I'd have to look at it again, but is that you have to have PC for the specific... In a specific intent crime, you have to have PC for the intent, because I don't think that you have to have PC for each element with respect to other crimes. But I think specific intent crimes are a bit different. My recollection here is that, again, if they had slowed down a bit, that they did have some evidence that they had, sometime in the past, given these people this information, actually, that there was some customs agent or somebody who claims that many years before they had actually informed this guy of this requirement. That's not, I mean, that's certainly... Not in the affidavit, but I thought it was in the district court hearing, that there was some, because there was some evidentiary dispute about whether this report was going to be admitted. But there was some government report which suggested... So, again, if there had been, if this had slowed down, they may well have been able to establish the probable cause on both issues. Well, that might be, Your Honor. I just wanted to quickly address, again, the... Very quickly, because... Yes, Your Honor. Just to note that the Gord case, which the defense relies on pretty extensively and their answering briefs were taken on Bonk yesterday, as I'm sure the Court knows. And it's important to note that the government need not disprove the possibility of compliance in the government's briefs laid us out in order to have probable cause. I have one last question. Just give me a yes-no answer so we can move on. There, I think in your briefs, and there's some discussion in Gord, there's... Do you agree that we're reviewing this de novo? That's what I want to know. Yes. Are we reviewing probable cause de novo? Yes. Because there were no factual findings, but no hearings. There's no deference to the magistrate or anything like that? No, Your Honor. Okay. Thank you. The case just argued will be submitted. Your Honor, can I just address that very briefly? No. It's somewhat unusual. We'd ask the Court to defer three weeks before you actually submit the case because we're pursuing global resolution talks with the government. Oh. And apparently that can't happen if you actually submit it for decision today. So we'd ask for you to submit a decision in three weeks and in that time we'll notify the Court whether or not the government will be proceeding on its appeal. If the Court is amenable to it, the government has no opposition, but it's really up to the Court. That's the government's position. All right. Well, if you're in discussions, we'll delay submission. Thank you. We'd ask for three weeks, Your Honor. We'll file a status report if it's okay with the Court and just want to make sure that the Court understands that even if we were to reach some kind of a disposition, the government would actually still need to seek approval from the Solicitor General before we move to dismiss. So it could take up to three weeks. All right. Will you give us the status report in three weeks? Yes, Your Honor. Yes, Your Honor. Thank you, counsel. Thank you very much. The case just argued will not be submitted.
judges: Reinhardt, Kozinski, Berzon